# KEMPSHALL *v.* ROYCE.

EVIDENCE; NOTICE TO PRODUCE DOCUMENTS; PATENTS; INTERFERENCE.

1. Where, for four days after a notice had been given to produce original letters, testimony continued to be taken, and counsel receiving the notice made no effort to produce them, saying that, in his opinion, they were irrelevant, but if he could obtain them he would produce them, and the party writing them produced and read letter-press copies and offered the same in evidence, the portions of the deposition containing the letter-press copies will not be suppressed for the irregularity in filing the copies with the deposition,—especially where, previous to giving the notice, counsel for the parties had stipulated that letter-press copies should be admitted and used in evidence in lieu of the originals. (Citing *McCormick* v. *Cleal*, 12 App. D. C. 338.)

2. Where, in an interference case involving an invention relating to golf balls between an applicant, who was the secretary, and a patentee, who was the president, of a company manufacturing golf balls, it appeared that the applicant conceived the invention and communicated it to the patentee, sending him balls to play with which embodied the invention, and receiving commendations for their excellence; that the patentee then applied for a patent for the invention, saying that he did so to protect the interests of the company, and that at any time within two years the other party could easily prove priority; and that the patentee failed to testify in contradiction of the case made against him,—it was *held,* affirming a decision of the Commissioner of Patents, that the applicant, and not the patentee, was the inventor.

3. A party by his conduct in doing acts, or in omitting to act when circumstances would seem to require action, may often furnish evidence more convincing in leading to a conclusion than the sworn testimony of the party. (Following *Winslow* v. *Austin,* 14 App. D. C. 143.)

No. 411. Patent Appeals. Submitted January 17, 1907. Decided March 5, 1907.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference proceeding.     *Affirmed.*

· The facts are stated in the opinion.

KEMPSHALL *v.* ROYCE.

*Mr. William W. Dodge* for the appellant.

*Mr. Thomas W. Bakewell* and *Mr. Clarence P. Byrnes* for the appellee.

Mr. Justice McComas delivered the opinion of the Court:

This is an appeal by Eleazer Kempshall from a decision of the Commissioner of Patents awarding priority to Charles W. Royce over Kempshall, patentee, upon an issue in interference, stated in eleven counts, relating to golf balls. Less than half this number of counts should have sufficed. Three of the counts, which follow, contain all that is involved in this issue: "1. A playing-ball comprising a center piece built up of windings of elastic material, fibrous material interspersed in said windings, and held under pressure thereby, a layer of rubber thereon, and a suitable enclosing shell."

"3. A playing-ball comprising a center piece built up of a continuous winding in miscellaneous directions of cured rubber strip, fibrous material interspersed in said windings, said strip being continued into windings in miscellaneous directions to form a layer over said center piece, and a shell."

"8. A playing-ball comprising a center piece built up of hair suitably compressed and intermingled in windings of cured rubber, and an enclosing shell."

Kempshall filed an application December 14, 1903, and a patent was granted to him May 31, 1904, for a golf ball. Royce copied this patent in his application, filed November 8, 1904. The Patent Office tribunals agree that there is invention in a center for a golf ball of the peculiar construction we here consider. To form this center a cured rubber strip, thin and flat, is wound while suitably compressed into a ball, and, during the winding, strands of hair are interspersed between the layers of rubber and intermingled in every direction, so that the ball, when wound, is made up of hair and rubber. Before this invention it was old usage to wind a strip of rubber like that here used, around a center, in forming a golf ball; and the only

invention found now by the Patent Office in the case before us was in substituting the hair interspersed in the winding, in place of the separate center heretofore used in golf balls.

Kempshall relied upon his filing date, December 14, 1903, and took no testimony. The testimony taken in behalf of Royce well supports his claim that he conceived this invention in October, 1903, and that disclosure and reduction to practice followed in November of that year. Kempshall and Royce are brothers-in-law, and in the fall of 1903 Kempshall was president and Royce the secretary of the Kempshall Manufacturing Company, which was engaged in making golf balls. Royce was busy in the factory at Arlington, New Jersey; Kempshall was almost daily playing golf on the golf fields of certain clubs about Boston.

Royce claims to have disclosed the invention and to have sent golf balls embodying the invention to Kempshall in November, 1903. It is conceded that the issue of this interference involves a question of originality, rather than priority. This invention was made independently by one or the other of these two parties. The Examiner of Interferences concluded that the testimony in behalf of Royce did not satisfy him, beyond a reasonable doubt, that Royce originated this golf-ball center. The Examiners-in-Chief and the Commissioner of Patents found that Royce claimed to be the inventor and to have disclosed the invention to Kempshall prior to Kempshall's filing date, and that Royce was corroborated by Crane; that Kempshall does not claim to have disclosed the invention to Royce, and does not deny his allegations; and that there is no warrant for holding Kempshall, the patentee, to be the inventor.

There was a dispute respecting the admissibility in evidence of nine letters from Kempshall to Royce, and of certain letters from Royce to Kempshall. The letters from Kempshall to Royce were fully proven, and were properly admitted in evidence. Counsel for Royce on March 17, 1905, when testimony was first taken in behalf of Royce, first secured a stipulation of record that letter-press copies of letters from Royce to Kemp-

shall should be admitted and used in evidence as fully as if they were the original letters, and when Royce, the secretary of the Kempshall Manufacturing Company, was about to read from the letter-press copy-book of the company, of which he was properly the custodian, Kempshall's counsel made frivolous objections. It appears from the record that Royce read from the letter-press book his own letter to Kempshall in Boston, dated November 2, 1903, despite objections from Kempshall's counsel; and thereupon counsel for Royce waived the stipulation just mentioned and notified Kempshall's counsel to produce the original letters written by Royce in due course of business, addressed to Mr. E. Kempshall, Westminster Hotel, Boston, and dated respectively upon certain dates in November and December specified. Kempshall's counsel did not offer to produce the letters, saying only that if, in his opinion, they were relevant and he could obtain them, he would produce them. The taking of the testimony continued during four different days and Kempshall's counsel made no effort to procure and produce any of these letters. Royce then proceeded to read, from the letter-press book he had produced, his letter to Kempshall dated November 4, 1903, and then identified and introduced Kempshall's original letter to Royce purporting to be an answer to the last two letters just read from the letter-press book. And so the testimony proceeded, Royce reading from the letter-press book his letter to Kempshall, and next reading the original letter from Kempshall to him in response. In each instance counsel for Royce filed a copy of the letter which Royce read from the letter-press book produced in evidence. The examination of witnesses continued on March 17th, 18th, and 21st, and was concluded on the 22d. In the beginning, the record shows that the parts of the letter-press book of the company containing letters of Royce to Kempshall was proferred in evidence after the stipulation had been entered into that letter-press copies of these letters should be used in evidence in lieu of the original, and when Kempshall's counsel objected unless he should be permitted to examine the whole contents of the letter-press book containing the proffered let-

ters, and thereafter, although notified to produce the originals on March 17th, he failed to produce the originals or give any account of them. Kempshall's counsel had time enough to produce the original letters, and the letter-press copies of Royce's letters to Kempshall in the letter-press book were admissible, and from this book Royce read the letters which he swears were letter-press copies of his letters to Kempshall and Royce's counsel, who had liberty to examine these letter-press copies in the book, declined to examine them only because he was not permitted to examine all the other letters of the company's secretary or other agents contained in the same book. In every instance the original letter from Kempshall to Royce admits of the receipt of Royce's letter read from the letter-press book, or the receipt of golf balls mentioned in Royce's letters to Kempshall. The record convinces us that, during the days when Royce was being examined as a witness, Kempshall's counsel had ample time in which to produce the original letters, and that the letter-press book containing the letters from Royce to Kempshall was introduced in evidence. The only irregularity that appears is the filing of copies of the letters contained in the letter-press book. Kempshall's counsel, we repeat, had an opportunity to inspect these letters, and to cross-examine Royce respecting them. He did neither. His untenable objections and his conduct clearly show he was fully satisfied of the genuineness of these letters. Kempshall's counsel, upon cross-examination, asked Royce if all the statements contained in his letters were true, and Royce swore that they were true and that he had produced all of the correspondence he had had with Kempshall relative to this matter; and we observe that many of the most material statements in the letters objected to were affirmed by Royce upon his cross-examination.

The Commissioner of Patents overruled the motion of Kempshall's counsel to suppress the portions of Royce's deposition in which Royce's letters to Kempshall are included in the record. The Commissioner overruled this motion, relying upon *McCormick* v. *Cleal,* 12 App. D. C. 338. We do not think

the decision of the Commissioner constitutes reversible error in this case. We are satisfied that the oral testimony of Royce and of Crane and the letters of Kempshall fully support the conclusion reached by the Examiners-in-Chief and by the Commissioner, even if Royce's letters be not considered.

We will not in detail review the testimony which convinced the Examiners-in-Chief and the Commissioner that Royce first conceived and reduced to practice this invention.

Royce in October, 1903, conceived the invention in the factory at Arlington, New Jersey, and then caused golf balls to be made embodying it. He called them "Kempshall Flyer Click Balls." His statement of the mode of making these balls clearly brings them within the issue of this interference, and Royce continued to manufacture these balls in large quantities from that time until he testified in this case. He was positive he had received no direction or suggestions from Kempshall, while Kempshall's original letters show that Royce had written him describing this new click ball, and that Kempshall was at first a severe critic of Royce's invention, and dissuaded him from making them, and later Kempshall, having tried the new click balls sent by Royce to him, was less hostile, and finally became greatly impressed with their merits, and in his letter to Royce dated December 15, 1903, says: "The click ball is giving excellent satisfaction here, and you deserve great credit. I think Mr. Chapman will see his way clear to continue your salary at $6,000 per year."

Soon thereafter Kempshall was so much pleased that he filed in his own name an application for a patent upon Royce's invention. Crane, vice president and treasurer of the Kempshall Company, corroborates Royce, testifying that balls composed of hair and a continuous strip of rubber sheeting to form the core were first brought to his attention by Royce in the fall of 1903, and that his company directed that these balls be tested to prove their utility, with intent that a patent be applied for if the test was satisfactory. Crane also says that at a directors' meeting in May, 1904, when Kempshall was present, the merits of the new click ball were being discussed, when

Kempshall made the statement that he had applied for a patent, and Crane at once asked, and so did Royce, how was it possible for Kempshall to apply for a patent when the invention was not his, and Mr. Chapman remarked that he supposed, of course, Kempshall would protect the interests of the company, when Crane rejoined that it did not seem to him that it was a question of how Kempshall could protect the interests of the company, but the question was how was it possible for Kempshall to swear to the originality of the invention, which was not his own. Kempshall replied that he simply did it as a precautionary measure to protect the interests of the company, when Crane indignantly answered that Kempshall should not take out a patent for an invention to which he could not swear he was the original inventor. After this meeting adjourned, in walking up Broadway, Royce again asked Kempshall why he applied for a patent knowing this ball to be Royce's invention, and Kempshall repeated that he did it as a matter of precaution, and added that, at any time within two years from the date of his application for a patent, Royce could easily prove priority. The failure of Kempshall to testify to contradict Chapman, Crane, and Royce, or to explain, if he could explain, these admissions, is significant. We are satisfied that on that date Kempshall admitted outright that he was not the inventor of this golf ball, while Kempshall's own letters to Royce show that he all the while regarded Royce as the inventor of this golf ball, which he had at first disparaged and later approved. The expressions of this court in a case in which Winslow relied upon the prima facie case made by the record in his favor apply here: "Instead of a resort to proof of the facts as they really existed, Winslow has elected to rest upon a technicality, or the prima facie effect of a status acquired in the office by virtue of seniority of application for his original patent. This may serve in some cases, but it is not always safe to rest exclusively upon it. A party by his conduct in doing acts, or in omitting to act when circumstances would seem to require action, may often furnish evidence more convincing in leading to a conclusion than even the sworn testi-

mony of the party; and that would seem to be the case here."
*Winslow* v. *Austin,* 14 App. D. C. 143.

It would be a denial of justice if the prima facie case of
Kempshall, re-enforced by the considerable delay of Royce in
making his application, should outweigh the culpable attitude
and conduct of Kempshall and his failure to testify in answer
to the serious charges against him made by Royce and Crane.
The delay of Royce was largely caused by Kempshall's failure
to assign to his company this very patent, after he had assured
the officials at the directors' meeting that his motive in obtain-
ing the patent was to protect the interests of the company; and
it appears that members of the company, which had found
Kempshall a very expensive president, temporized too long,
in the hope that Kempshall would assign the patent, and thus
end all controversy.

We have no doubt that Royce is the inventor of the subject-
matter of this interference, and that in the fall of 1903 he
disclosed this invention to Kempshall.

The decision of the Commissioner of Patents in this case
must therefore be affirmed, and the clerk of this court will
certify this decision and opinion to the Commissioner of Pat-
ents in accordance with law.                    *Affirmed.*